**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**ROBERT SELEVAN and ANNE**
**RUBIN,**[1]

                    **Plaintiffs,**            **1:06-CV-291**
                                                    **(GLS\DRH)**

        **v.**

**NEW YORK THRUWAY AUTHORITY**
**and JOHN L. BUONO,**[2]

                    **Defendants.**
_____

**APPEARANCES:**                  **OF COUNSEL:**

**FOR THE PLAINTIFFS:**

LOCKS LAW FIRM, PLLC         ANDREW P. BELL, ESQ.
110 East 55th Street
New York, New York 10022

**FOR THE DEFENDANTS:**

HON. ANDREW CUOMO         NELSON SHEINGOLD
New York State Attorney General    Assistant Attorney General
The Capitol
Albany, New York 12224

_____

[1]Selevan and Rubin bring this lawsuit individually and on behalf of all others similarly situated.  *See Am. Compl. ¶1, Dkt. No. 20.*

[2]Defendant Buono is Chairman and Chief Executive Officer of the New York State Thruway Authority.  *See id. ¶10.*  He is sued both individually and in his official capacities.  *See id.*

**Gary L. Sharpe**
**U.S. District Judge**

## MEMORANDUM-DECISION AND ORDER

### I. Introduction

Plaintiffs allege, pursuant to 42 U.S.C. § 1983, that defendants

violated their constitutional rights by implementing and enforcing

discriminatory toll practices on Grand Island Bridge in Grand Island, New

York.  Pending under Federal Rule of Civil Procedure 12(b)(6) is

defendants' motion to dismiss.  *See Dkt. Nos. 6, 21.*  For the reasons that

follow, defendants' motion is granted.

### II. Facts

Robert Selevan resides in Nassau County, New York.  *See Am.*

*Compl. ¶5, Dkt. No. 20.*  Anne Rubin is a United States citizen residing in

Ontario, Canada.  *See id. ¶6.*  Both Selevan and Rubin have used the

Grand Island Bridge and paid tolls there during the period relevant to this

lawsuit.  *See id. ¶¶5-6.*

The Grand Island Bridge is owned and operated by defendant, New

York Thruway Authority (NYTA).  *See id. ¶¶13-14.*  During the period

relevant to this lawsuit, the NYTA implemented and maintained a new toll

2

policy on Grand Island Bridge.  *See Am. Compl. ¶12, Dkt. No. 20.*
According to that policy, motorists who show proof of Grand Island
residency are afforded a discounted toll rate.[3]  *See Am. Compl. ¶12, Dkt.*
*No. 20.*  The normal toll on Grand Island Bridge is $0.75, but residents of
Grand Island have been afforded a discount off their toll price of up to
$0.66.[4]  *See id. ¶21.*  Consequently, Selevan and Rubin, motorists who are
non-residents of Grand Island, pay higher tolls prices than Grand Island
residents when they traverse the bridge.  *See id. ¶23.*

### III.  Procedural History

On March 7, 2006, plaintiffs filed their original complaint in this court
pursuant to 42 U.S.C. § 1983.  *See Dkt. No. 1.*  On May 4, defendants
moved to dismiss the complaint.  *See Dkt. No. 6.*  At an oral hearing held
on August 3, the court granted plaintiffs additional time to amend their
complaint.  *See Dkt. No. 18.*  Plaintiffs filed an amended complaint on
September 5, and defendants renewed their motion to dismiss on
September 26.  *See Dkt. Nos. 20, 21.*  The motion is now fully briefed.  *See*

---

[3]Motorists can prove their residency on Grand Island by presenting the NYTA with a vehicle registration or other residency-type document.  *See Am. Compl. ¶22, Dkt. No. 20.*

[4]The toll rates are set out in detail at the NYTA website: http://www.thruway.state.ny.us/ezpass/discount.html#grandres.  *See id. ¶21.*

3

*Dkt. Nos. 21, 24, 25.*

# IV. **Discussion**

## A. **Motion to Dismiss Standard**

Rule 12(b)(6) provides that a cause of action shall be dismissed if a complaint fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6).  In other words, the court should dismiss the complaint pursuant to Rule 12(b)(6) if "it appears beyond doubt that the plaintiff can prove no set of facts in support of the complaint which would entitle him to relief." *Twombly v. Bell Atl. Corp.*, 425 F.3d 99, 106 (2d Cir. 2005) (internal quotation marks and citation omitted).  "A court's task in ruling on a Rule 12(b)(6) motion is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *AmBase Corp. v. City Investing Co. Liquidating Trust*, 326 F.3d 63, 72 (2d Cir. 2003) (internal quotation marks and citation omitted). Therefore, in reviewing a motion to dismiss, a court "must accept the facts alleged in the complaint as true and construe all reasonable inferences in [the plaintiff's] favor." *Fowlkes v. Adamec*, 432 F.3d 90, 95 (2d Cir. 2005) (citation omitted).

**B.   Standing**[5]

Defendants argue that plaintiffs lack standing to pursue their constitutional claims.  In every federal case, the party seeking to invoke federal jurisdiction must establish standing to prosecute the action.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *see also Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006) (The "threshold question in every federal case [is] determining the power of the court to entertain the suit."); *Ctr. for Reprod. Law v. Bush*, 304 F.3d 183, 191 (2d Cir. 2002) ("A federal court has jurisdiction *only if* a claim presents a 'case' or 'controversy' under Article III of the U.S. Constitution.").

"In essence[,] the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues."  *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004) (internal quotation marks and citation omitted).  "Standing generally has two aspects: constitutional standing, a mandate of the 'case or controversy' requirement in Article III, and prudential considerations of standing, which involve 'judicially self-imposed limits on the exercise of federal jurisdiction.'"

---

[5]The Second Circuit recently stated, "[w]e do not require that each member of a class submit evidence of personal standing."  *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006).  However, "[t]he class must...be defined in such a way that anyone within it would have standing." *Id.* at 264.

*Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 126 (2d Cir. 2003) (internal quotation marks and citation omitted).  "It is clear that constitutional standing is a jurisdictional prerequisite to suit, [and] prudential considerations of standing are also generally treated as jurisdictional in nature."  *Lerner*, 318 F.3d at 126-127; *see also Leibovitz v. New York City Transit Auth.*, 252 F.3d 179, 184 (2d Cir. 2001) ("Prudential and constitutional rules of standing are alike 'threshold determinants of the propriety of judicial intervention.'") (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).  Thus, the Court is obligated to determine whether plaintiffs have standing under Article III and whether, if such standing exists, any prudential considerations limit the Court's jurisdiction to reach the merits of their claims.

### 1.   Article III Standing

The Supreme Court has articulated the constitutional requirements imposed by Article III as "irreducible constitutional minim[a]."  *Bennett v. Spear*, 520 U.S. 154, 167 (1997) (citing *Lujan*, 504 U.S. at 560).  In analyzing a plaintiff's standing, the central issue is "whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to justify exercise of

the court's remedial powers on his behalf." *U.S. v. Vazquez,* 145 F.3d 74, 81 (2d Cir. 1998) (internal quotation marks and citation omitted). Therefore, a plaintiff's standing must be resolved "irrespective of the merits of [the] substantive claims [alleged]." *Bordell v. Gen. Elec. Co.*, 922 F.2d 1057, 1060 (2d Cir. 1991).

"Article III of the United States Constitution confines federal courts to adjudicating actual 'cases' and 'controversies.'" *Allen v. Wright*, 468 U.S. 737, 750 (1984). A plaintiff asserting standing must demonstrate "a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy." *Sierra Club v. Morton*, 405 U.S. 727, 731 (1972).

In particular, plaintiffs must "satisfy three elements to come within the judicial power of the federal courts." *L.A.M. Recovery, Inc. v. Dep't of Consumer Affairs*, 377 F. Supp. 2d 429, 437 (S.D.N.Y. 2005). "First and foremost, there must be alleged (and ultimately proved) an injury in fact - a harm suffered by the plaintiff that is concrete and actual or imminent, not conjectural or hypothetical." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998) (internal quotation marks and citation omitted). "Second, there must be causation - a fairly traceable connection between

7

the plaintiff's injury and the complained-of conduct of the defendant."  *Id.*;

*see also Lujan*, 504 U.S. at 560-61.  "[T]hird, there must be redressability -

a likelihood that the requested relief will redress the alleged injury."  *Id.*;

*see also Denney*, 443 F.3d at 263 (citing *Lujan*, 504 U.S. at 561).

"[E]ach element of Article III standing 'must be supported in the same

way as any other matter on which the plaintiff bears the burden of proof,

*i.e.*, with the manner and degree of evidence required at the successive

stages of the litigation.'"  *Bennett*, 520 U.S. at 167-168 (citing *Lujan*, 504

U.S. at 561).  "Thus, while a plaintiff must set forth by affidavit or other

evidence specific facts to survive a motion for summary judgment...and

must ultimately support any contested facts with evidence adduced at trial,

at the pleading stage, general factual allegations of injury resulting from the

defendant[s'] conduct may suffice[.]"  *Id.* at 168 (internal quotation marks

and citation omitted).  "[F]or on a motion to dismiss[,] [the court must]

presume that general allegations embrace those specific facts that are

necessary to support the claim."  *Id.* (internal quotation marks and citation

omitted).

## 2.    Prudential Standing

Even if plaintiffs have Article III standing, prudential considerations

may limit their ability to invoke federal jurisdiction. *See Lamont v. Woods*, 948 F.2d 825, 829 (2d Cir. 1991) ("If [the Article III] constitutional minima are satisfied, a court may nevertheless deny standing for prudential reasons[.]").  Prudential standing "embodies judicially self-imposed limits on the exercise of federal jurisdiction." *Elk Grove Unified Sch. Dist.*, 542 U.S. at 11 (internal quotation marks and citation omitted).

The Supreme Court has said that "[e]ven in cases concededly within [the court's] jurisdiction under Article III, [the court should] abide by a series of rules under which [it has] avoided passing upon a large part of all the constitutional questions pressed upon [it] for decision." *Id.* (internal quotation marks and citation omitted).  The court "must balance the heavy obligation to exercise jurisdiction, *Colorado River Water Conservation Dist. v. U.S.*, 424 U.S. 800, 820 (1976), against the 'deeply rooted' commitment 'not to pass on questions of constitutionality' unless adjudication of the constitutional issue is necessary, *Spector Motor Service, Inc. v. McLaughlin*, 323 U.S. 101, 105 (1944)." *Id.*  Consistent with these principles, standing jurisdprudence contains two strands, Article III standing and its counterpart, prudential standing.  *See id.*

Prudential considerations include "the general prohibition on a

litigant's raising another person's legal rights, the rule barring adjudication

of generalized grievances more appropriately addressed in the

representative branches, and the requirement that a plaintiff's complaint fall

within the zone of interests protected by the law invoked."  *Allen*, 468 U.S.

at 751.  To satisfy the "zone of interests" requirement, a plaintiff must show

that "the interest sought to be protected by the complainant is arguably

within the zone of interests to be protected or regulated by the statute or

constitutional guarantee in question[.]"  *Ass'n of Data Processing Serv.*

*Organizations, Inc. v. Camp*, 397 U.S. 150, 153 (1970).

 "Finally, a related aspect of standing, statutory standing, is broadly

described as a part of the prudential considerations regarding the proper

limits of jurisdiction."  *Lerner*, 318 F.3d at 126.  "Where the injury stems

from the violation of statutorily-created rights, the issue for prudential

standing is 'whether the...statutory provision on which the claim rests

properly can be understood as granting persons in the plaintiff's position a

right to judicial relief.'"  *Vazquez v. Salomon Smith Barney Inc.*, 01-CV-

2895, 2002 U.S. Dist. LEXIS 46, at *11 (S.D.N.Y. Jan. 4, 2002) (citing

*Warth*, 422 U.S. at 500).  "Without such limitations...the courts would be

called upon to decide abstract questions of wide public significance even

though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights."  *Elk Grove Unified Sch. Dist.*, 542 U.S. at 11 (internal quotation marks and citation omitted).

As stated, to have standing, plaintiffs must satisfy both the Article III requirements and the prudential requirements for each claim asserted. *See Lerman v. Bd. of Elections in City of New York*, 232 F.3d 135, 143 (2d Cir. 2000) (citing *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 955 (1984) ("In addition to the limitations on standing imposed by Art. III's case-or-controversy requirement, there are prudential considerations that limit the challenges courts are willing to hear.")); *Valley Forge Christian Coll. v. Americans United for Separation of Church and State*, 454 U.S. 464, 471 (1982) ("The term 'standing' subsumes a blend of constitutional requirements and prudential considerations[.]"); *Singleton v. Wulff*, 428 U.S. 106, 112 (1976) (holding that constitutional requirements under Article III and prudential requirement that plaintiffs be the "proper proponents of the particular legal rights on which they base their suits" are distinct aspects of standing inquiry).  As such, the court now turns to the applicability of these principles to each of plaintiffs' asserted claims.

11

### a.   Commerce Clause Claim

Defendants argue that plaintiffs lack standing to pursue their

commerce clause claim for three reasons.  First, defendants claim that the

alleged harm is insufficient to constitute cognizable injury-in-fact under the

confines of the United States Constitution.  More specifically, defendants

maintain that plaintiffs have asserted nothing more than generalized

grievances and thus have failed to satisfy the injury-in-fact requirements

under both strands of the standing analysis.  Second, defendants maintain

that plaintiffs cannot satisfy the third prong of Article III standing,

redressability, because the injunctive relief sought will not benefit plaintiffs

but will instead harm Grand Island residents who will be forced to pay

higher tolls.  Finally, defendants maintain that plaintiffs' commerce clause

claim does not fall within the "zone of interests" protected by the

Commerce Clause.  In response, plaintiffs argue that their alleged injury,

namely, the inability to benefit from the reduced toll rates enjoyed by Grand

Island residents coupled with the pecuniary burden of paying the higher

non-residential toll rate, is concrete, particularized, and capable of being

redressed by the relief sought.

The court will first address defendants' concerns regarding injury-in-

fact and redressability.  As stated, "[t]o qualify as a constitutionally

sufficient injury-in-fact, the asserted injury must be concrete and

particularized as well as actual or imminent, not 'conjectural' or

'hypothetical.'"  *Baur v. Veneman*, 352 F.3d 625, 632 (2d Cir. 2003) (citing

*Lujan*, 504 U.S. at 560).  "Because the standing inquiry focuses on whether

the plaintiff is the proper party to bring...suit, the injury analysis often turns

on the nature and source of the claim asserted."  *Id.* (citing *Raines v. Byrd*,

521 U.S. 811, 818 (1997)).  The court must assess "whether the injury

affects the plaintiff in a personal and individual way[.]"  *Id.*  In addition,

plaintiffs' "injury must be actual or imminent to ensure that the court avoids

deciding a purely hypothetical case in which the projected harm may

ultimately fail to occur."  *Id.*

The nature of plaintiffs' claim is that the Grand Island toll policy

imposes a discriminatory commercial barrier on interstate commerce in

violation of the Commerce Clause.  Plaintiffs define their injury as the

burden of paying higher toll rates than Grand Island residents and the

denial of toll discounts based on their residency status.  This injury is a

commercial, economic injury that is concrete and specific to them.  It is also

a current, ongoing harm.  While it is true that generalized grievances

against a policy violating the Commerce Clause are insufficient to confer Article III standing, *see Mariana v. Fisher*, 338 F.3d 189, 206 (3d Cir. 2003),[6] the Supreme Court has explained that "[c]onsumers who suffer [higher costs] from regulation forbidden under the Commerce Clause satisfy the standing requirements of Article III," *GMC v. Tracy*, 519 U.S. 278, 286 (1997).[7]  "It is well established that consumers injured by impermissible regulations satisfy Article III's standing requirements."  *Harvey v. Veneman*, 396 F.3d 28, 34 (1st Cir. 2005).  Accordingly, plaintiffs have satisfied the first prong of the court's standing analysis, injury-in-fact.[8]

---

[6]The *Mariana* plaintiffs, cigarette smokers, sued Pennsylvania's Attorney General and Secretary of Revenue seeking injunctive relief from the implementation and enforcement of the national tobacco settlement known as the Master Settlement Agreement (MSA). The Third Circuit dismissed plaintiffs' claims on jurisdictional grounds rather than on the merits after finding that the smokers lacked standing because they stated generalized grievances and conjectural injury allegations. *See Mariana*, 338 F.3d 189, 205-206 (3d Cir. 2003).
  The Third Circuit explained, "[b]ecause Plaintiffs are not asserting their own legal interests but instead those of third parties[,]...[their] Commerce Clause arguments devolve into nothing more than generalized grievances[.]...Accordingly, the doctrine of prudential standing precludes us from hearing such claims."  *Id.* at 206.

[7]The *GMC* court explained, that "cognizable injury from unconstitutional discrimination against *interstate* commerce does not stop at members of the class against whom a State ultimately discriminates, and customers of that class may also be injured[.]"  *GMC v. Tracey*, 519 U.S. 278, 286 (1997) (emphasis added).
  Defendants correctly point out that the defendants in *GMC* ultimately prevailed.  On the merits, the *GMC* Court held that Ohio's differential tax treatment between sales of gas by domestic utilities subject to regulation and sales of gas by other entities did not violate the Commerce Clause or Equal Protection Clause since Ohio was acting as a market participant. *See id.* at 301.  Here, before the court can reach the merits of plaintiffs claims, it must decide whether plaintiffs have standing.

[8]Defendants also cite *DaimlerChrysler Corp. v. Cuno* in support of its contention that plaintiffs' alleged injury is not "concrete and particularized."  *See DaimlerChrysler Corp. v.*

14

Defendants argue that the relief plaintiffs seek would not redress their alleged injury, or, at the very least, would be too speculative to satisfy the third standing requirement.  Plaintiffs seek injunctive relief, restitution, and money damages.  In particular, plaintiffs seek an order leveling the toll prices on Grand Island Bridge.  This relief, if granted, would cure the alleged discrimination by putting plaintiffs on equal footing with Grand Island residents.  Accordingly, plaintiffs have satisfied the third prong of Article III standing, redressability.

The court next considers defendants' final argument, which turns on a consideration of prudential standing.  Defendants argue that plaintiffs' claim does not fall within the "zone of interests" that the Commerce Clause was designed to protect.  An examination of the Commerce Clause and its intended purpose is useful in determining whether plaintiffs' interests fall

---

*Cuno*, 126 S. Ct. 1854, 1862 (2006).  The *DaimlerChrysler* plaintiffs were local and city taxpayers who sued alleging that tax breaks for defendant car manufacturer violated the Commerce Clause.  *See id.* at 1859.  Under a contract with a city, the manufacturer agreed to expand its local assembly plant in exchange for the city agreeing to give it a tax break.  *See id.* The State also allowed the manufacturer a credit against the state franchise tax.  *See id.* Plaintiffs claimed that they were injured because the tax breaks for the manufacturer diminished the funds available to the city and State, imposing a disproportionate burden on them.  *See DaimlerChrysler Corp.*, 126 S. Ct. at 1862.  The Court held that it was unclear whether the tax breaks did in fact deplete the treasury and that the taxpayers' alleged injury was conjectural or hypothetical because it was dependent on legislators' responses.  *See id.* *DaimlerChrysler* is factually distinguishable because the *DaimlerChrysler* plaintiffs alleged a theoretical injury which could not be proven, whereas the plaintiffs here allege actual economic harm.

within the relevant zone of interests to be protected.  *See Nat'l Solid Waste Mgmt. Ass'n v. Pine Belt Reg'l Solid Waste Mgmt. Auth.*, 389 F.3d 491, 499 (5th Cir. 2004).

The Commerce Clause of the United States Constitution grants Congress the authority to "regulate Commerce...among the several States." U.S. CONST. art. I, § 8, cl. 3.  The Supreme Court has long held that the clause contains both an affirmative grant of power and a "further, negative command, known as the dormant Commerce Clause...that prevents a State from...placing burdens on the flow of commerce across its borders that commerce wholly within those borders would not bear."  *Am. Trucking Associations, Inc. v. Mich. Public Serv. Comm'n*, 545 U.S. 429, 433 (2005) (internal quotation marks and citations omitted).

Moreover, "the Commerce Clause was not only designed to protect the states, but was also 'intended to benefit those [individuals] who...are engaged in interstate commerce.'"  *Oxford Associates v. Waste Sys. Auth. Of E. Montgomery County*, 271 F.3d 140, 146 (3d Cir. 2001) (quoting *Dennis v. Higgins*, 498 U.S. 439, 448-49 (1991)).  The Supreme Court has explained that "every consumer may look to the free competition from every producing area in the Nation to protect him from exploitation by any."  *Id.*

16

(quoting *H.P. Hood & Sons, Inc. v. DuMond*, 336 U.S. 525, 539 (1949)).

Here, plaintiffs challenge defendants' toll policy under the so-called dormant Commerce Clause.  A State law or policy violates the dormant Commerce Clause if it "clearly discriminates against interstate commerce in favor of intrastate commerce," or "if it imposes a burden on interstate commerce incommensurate with the local benefits secured."  *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 168 (2d Cir. 2005).   A policy will also be invalid under the dormant Commerce Clause "if it has the practical effect of extraterritorial control of commerce occurring entirely outside the boundaries of the state in question."  *Id.*  Thus, the issue is whether plaintiffs have standing to challenge defendants' actions as either discriminatory against out-of-state economic interests or excessively burdensome on interstate commerce.  *See United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 261 F.3d 245, 255 (2d Cir. 2001).

The principles governing the dormant Commerce Clause preserve the struggle "to develop a set of rules by which [courts] may preserve a national market without needlessly intruding upon the States' police powers, each of which no doubt has some effect on the commerce of the Nation."  *United*

*Haulers Assoc., Inc.*, 261 F.3d at 254 (internal quotation marks and citation omitted).  In other words, the dormant Commerce Clause was designed to "prevent economic protectionism and retaliation between states and to allow markets to flourish across state borders, thus prohibiting 'laws that would excite...jealousies and retaliatory measures between states.'"  *Ben Oehrleins & Sons & Daughter, Inc. v. Hennepin County*, 115 F.3d 1372, 1382 (8th Cir. 1997) (quoting *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 390 (1994)).

"Discrimination under the dormant Commerce Clause simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter."  *Allocco Recycling, Ltd. v. Doherty*, 378 F. Supp. 2d 348, 358 (S.D.N.Y. 2005) (internal quotation marks and citation omitted).  Therefore, "the relevant zone of interests is...protection of out-of-state economic interests."  *Id.; see also Nat'l Solid Waste Mgmt. Ass'n*, 389 F.3d at 500.[9]  Plaintiffs must therefore show that

---

[9]In *National Solid Waste Management Association*, plaintiffs collected, processed and disposed of solid waste to transfer stations and landfills that they or their affiliates operated.  *See Nat'l Solid Waste Mgmt. Ass'n v. Pine Belt Reg'l Solid Waste Mgmt. Auth.*, 389 F.3d 491, 495 (5th Cir. 2004).  All of the waste originated within the State, and none was shipped out of the State.  *See id.*  The Fifth Circuit held that the plaintiffs lacked judicial standing to challenge flow-control ordinances because plaintiffs did not ship any waste in or out of state and did not allege that they had any plans to do so.  *See id.*  The court explained that plaintiffs lacked standing because their alleged injury was "not related to any out-of-state characteristic of their business."  *Id.* at 500.

they have been harmed "precisely because [the policy] burdened interstate commerce." *L.A.M. Recovery, Inc.*, 377 F. Supp. 2d at 439.

For purposes of their Commerce Clause claim, Selevan and Rubin define the relevant market as the "market of access to Grand Island." However, they fail to allege any in-state market competitor that is favored to the detriment of comparable out-of-state market providers.  Moreover, although plaintiffs allege in conclusory fashion that while traversing Grand Island Bridge they are engaged in a form of interstate commerce, namely, shopping and tourism, the alleged harm is strictly local.  Plaintiffs have not alleged that they are part of an interstate market or that their market has been jeopardized in favor of local interests.  In fact, plaintiffs have not even alleged that the questioned portion of Grand Island Bridge serves as an access route from one State to another.  As far as the court can tell, the questioned portion serves only New York State and treats both New York non-Grand Island residents and out-of-State non-Grand Island residents alike.

"The Commerce Clause does not, of course, invalidate all State policies restricting commerce."  *See Kassel v. Consol. Freightways Corp. of Del.*, 450 U.S. 662, 669-70 (1981).  Indeed, "there is a residuum of power in

the state to make laws governing matters of local concern which
nevertheless in some measure affect interstate commerce or even, to some
extent, regulate it." *Id.* at 669 (internal quotation marks and citation
omitted).  The Seventh Circuit in *Endsley v. City of Chicago* held that even if
a thruway authority monopolized an access route, setting tolls fell within the
ambit of legitimate market behavior and posed no serious threat to
interstate commerce.  *See Endsley v. City of Chicago*, 230 F.3d 276, 283-
85 (7th Cir. 2000).

       Plaintiffs bear the burden of proving that the Grand Island toll policy is
either facially discriminatory or imposes a burden on interstate commerce
incommensurate with the local benefits secured.  *See Grand River Enters.
Six Nations, Ltd.*, 425 F.3d at 168.  "There is no general rule that once
something (either passenger or freight) embarks on a journey that will
eventually carry it between two states, every moment of that journey,
through the last conceivable moment of travel, is necessarily interstate..."
commerce, as envisioned by the Commerce Clause analysis.  *Packard v.
Pittsburgh Transp. Co.*, 418 F.3d 246, 255 (3d Cir. 2005).  The United
States Supreme Court has recently upheld a fee taxing purely local activity
that does not affect entry into the State or transactions spanning multiple

States under the dormant Commerce Clause.  *See Am. Trucking Associations*, 545 U.S. at 437.  Here, plaintiffs do not suggest that the Grand Island Bridge is the only means of access into the State of New York, nor do they allege that their ineligibility for the Grand Island resident discount discourages or hinders interstate commerce.  The true gravamen of plaintiffs' complaint is that the Grand Island toll policy discriminates against New York citizens traversing a bridge within the State.  Construing the facts in the light most favorable to the plaintiffs, any alleged burden on interstate commerce here is merely negligible.

Plaintiffs have not convinced the court that their use of Grand Island Bridge, and therefore the Grand Island toll policy, is more than marginally within the zone of interests protected by the Commerce Clause.  A review of the amended complaint shows that the alleged harm is strictly local, not in any way demonstrative of "economic protectionism," and unlikely to lead to "jealousies and retaliatory measures between states."  *Ben Oehrleins & Sons & Daughter, Inc.*, 115 F.3d at 1382 (internal quotation marks and citation omitted).  These concerns, the hallmarks of the dormant Commerce Clause, are not claimed to be at issue here.  Plaintiffs cannot and do not identify any in-state commercial interest that is favored, directly

or indirectly, by the challenged toll policy at the expense of out-of-state competing interests.  Because their alleged injuries have little relation to out-of-State economic interests and do not fall within the zone of interests protected by the Commerce Clause, plaintiffs lack prudential standing. Accordingly, their Commerce Clause claim is dismissed.

### b.   Privileges and Immunities Clause Claim[10] ("P & I Clause")

Defendants argue that as a resident of New York, Selevan lacks Article III standing to sue defendants under the P & I Clause.  *See Schulz v. N.Y.S. Executive*, 960 F. Supp. 568, 576 (N.D.N.Y. 1997), *aff'd*, 162 F.3d 1148 (2d Cir. 1998).  In addition, they argue that because the P & I Clause does not extend to residents of foreign countries, as a resident of Canada, Rubin lacks standing to pursue her P & I claim.  *See United Bldg. & Constr. Trades Council of Camden County & Vicinity v. Camden*, 465 U.S. 208, 216 (1984).

Article IV, § 2, cl. 1, of the United States Constitution provides that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."  U.S. CONST. art. IV, § 2, cl. 1.  "The

_____

[10]The court has interpreted plaintiffs' Privileges and Immunities Clause claim as one brought pursuant to Article IV of the United States Constitution.

provision was designed to place the citizens of each State upon the same

footing with citizens of other States, so far as the advantages resulting from

citizenship in those States are concerned."  *Schulz*, 960 F. Supp. at 576

(internal quotation marks and citation omitted).  Furthermore,

> [t]he "privileges and immunities" secured by the original constitution, were only such as each state gave to its own citizens.  Each was prohibited from discriminating in favor of its own citizens, and against the citizens of other states.
>
> But the fourteenth amendment prohibits any state from abridging the privileges or immunities of the citizens of the United States, whether its own citizens or any others.  It not merely requires equality of privileges; but it demands that the privileges and immunities of all citizens shall be absolutely unabridged, unimpaired.

*Schulz*, 960 F. Supp. at 577 (citation omitted).  "[T]he Privileges and

Immunities Clause was intended to create a national economic union."  *Id.*

"However, the Privileges and Immunities Clause does not infuse

citizens with new and independent rights."  *Id.*  It "establishes a norm of

comity without specifying the particular subjects as to which citizens of one

State coming within the jurisdiction of another are guaranteed equality of

treatment."  *Id.* (citing *Austin v. N.H.*, 420 U.S. 656, 660 (1975)).  Indeed,

"the protection designed by [the Privileges and Immunities] clause...has no

application to a citizen of the State whose laws are complained of."[11]  *Id.*

(citing *Bradwell v. State of Illinois*, 83 U.S. 130, 138 (1872)).  "More

recently, in *Zobel v. Williams*, the Supreme Court rejected a challenge to

Alaska's dividend scheme, which provided for proportional payments based

on length of residency within the state[.]"  *Schulz*, 960 F. Supp. at 577.  The

*Zobel* court held:

> The statute does not involve the kind of discrimination which the
> Privileges and Immunities Clause of Art. IV was designed to prevent.
> That Clause was designed to insure to a citizen of State A who
> ventures into State B the same privileges which the citizens of State B
> enjoy.  The Clause is thus not applicable to this case....When a state
> distributes benefits unequally, the distinctions it makes are subject to
> scrutiny under the Equal Protection Clause of the Fourteenth
> Amendment.

*Id.* (citing *Zobel v. Williams*, 457 U.S. 55, 59 (1982)).

The Supreme Court has articulated policy reasons for denying

standing to in-state citizens attacking their own State's policies under the P

& I clause.  In observing that a Camden, New Jersey ordinance has an

identical impact on in-State citizens residing outside of Camden and out-of-

---

[11]"This does not mean that a state has unlimited power to abridge the privileges of its
own citizens."  *Schultz*, 970 F. Supp. at 577 (citing *Colgate v. Harvey*, 296 U.S. 404, 428-29
(1935)).  Instead, courts "must look elsewhere than to the language of the privileges and
immunities clause of the Fourth Article of the Constitution for the constitutional infirmity of the
[policy or regulation][.]"  *Id.* (citing *Colgate*, 296 U.S. at 428-29).

24

State citizens, the Supreme Court explained that "New Jersey residents at least have a chance to remedy at the polls any discrimination against them. Out-of-State citizens have no similar opportunity, [and]...the disadvantaged New jersey residents have no claim under the Privileges and Immunities Clause." *United Bldg. & Constr. Trades Council*, 465 U.S. at 217 (citation omitted).

### i.    Selevan

The binding precedent clearly provides that a resident of a State may not sue his own State under the P & I Clause.  Selevan is a resident of New York, and he seeks to sue an arm of the state, the New York Thruway Authority, under the P & I Clause.  Accordingly, he lacks standing, and his claim against defendants premised on violations of the Privileges and Immunities Clause is dismissed.[12]

### ii.    Rubin

Defendants argue that "under the plain language of the Privileges and Immunities Clause, it is not remotely tenable to claim that protections of this

---

[12]Plaintiffs concede that Selevan does not have standing to assert a claim under the P & I clause of Article IV.  However, they do contend that Selevan has standing to assert a claim under the 14th Amendment's P & I Clause, from where the "right to travel" has been spawned. Plaintiffs' Equal Protection claim is premised on violations of their fundamental right to travel, which has been deduced from the P & I Clause of the 14th Amendment.  The court will discuss plaintiffs' Equal Protection claim in more detail below.

clause extend to residents of foreign countries." *Def. Reply Mem., Dkt. No. 13*.  In support of this argument, they cite the Supreme Court's discussion of the terms "citizen" and "resident" in *United Bldg. & Constr. Trades Council v. Camden*.  *See United Bldg.*, 465 U.S. at 215.  The discussion to which defendants refer is the following:

> The [Privileges and Immunities] Clause is phrased in terms of *[S]tate* citizenship and was designed to place the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those States are concerned....We have never read the Clause so literally as to apply it only to distinctions based on state citizenship.  For example, in *Mullaney v. Anderson*, 342 U.S. 415, 419-420 (1952), the Court held that the Alaska Territory had no more freedom to discriminate against those not residing in the Territory than did any State to favor its own citizens, [a]nd...it is now established that the terms 'citizen' and 'resident' are 'essentially interchangeable,' *Austin v. New Hampshire*, 420 U.S. 656, 662, n.8 (1975), for purposes of analysis of most cases under the Privileges and Immunities Clause.

*United Bldg.*, 465 U.S. at 215-16 (internal quotation marks and citation omitted).

Because the P & I Clause was designed to put residents of different States on equal footing, a person must first be a resident (or a citizen) of a State before suing under the P & I Clause.  Therefore, just as Selevan, a resident of New York cannot sue New York under the P & I Clause, defendants argue that Rubin, a Canadian resident, cannot sue under the P

26

& I Clause.  Rubin resides in Ontario, Canada, but she is a citizen of the United States.  *See Pl. Compl., Dkt. No. 1*.  Accordingly, Rubin lacks standing, and her claim based on violations of the P & I Clause is dismissed.

### c.    Equal Protection Clause Claim

Plaintiffs' Equal Protection claim is grounded in the Fourteenth Amendment.  As mentioned, plaintiffs have satisfied the Article III standing requirements.[13]  Although neither party discusses plaintiffs' prudential standing in specific regard to their Equal Protection Clause claim, the court will do so *sua sponte*.  As such, the court will now consider whether plaintiffs' Equal Protection claim falls within the relevant "zone of interests."

"It is well-settled that the Equal Protection clause of both the federal and New York State constitutions are coextensive."  *Town of Southold*, 406 F. Supp. 2d at 241.  The Fourteenth Amendment of the United States Constitution prohibits a state from "denying any person within its jurisdiction the equal protection of the laws."  U.S. CONST. amend. XIV, § 1; *see also City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  The

---

[13]Courts that have refused to grant Article III standing to Commerce Clause or P & I Clause claims have nonetheless entertained Equal Protection Clause claims based on the same set of facts.  *See Town of Southold v. Town of East Hampton*, 406 F. Supp. 2d 227, 234-238 (E.D.N.Y. 2005).

central purpose of the Equal Protection Clause is to prevent states from

purposefully discriminating between individuals based on race or class-

based discriminatory animus.  *See Shaw v. Reno,* 509 U.S. 630, 642 (1993)

(revs'd on other grounds); *see also Graham v. Henderson*, 89 F.3d 75, 82

(2d Cir. 1996).

     "In order to establish a claim under the Equal Protection Clause, [ ]

plaintiff[s] must show that...[they] w[ere] selectively treated compared with

others similarly situated[.]"  *Stevenson v. Town of Oyster Bay*, 433 F. Supp.

2d 263, 266 (E.D.N.Y. 2006).  They must also show that "the selective

treatment was based on impermissible considerations, including"

membership in a suspect class or "the intent to inhibit or punish the

exercise of a constitutional right."[14]  *Id.*  Here, plaintiffs complain that the

---

[14]"When a state...action is subject to an [E]qual [P]rotection challenge, the level of judicial scrutiny varies with the type of classification utilized and the nature of the right affected."  *Mulroe v. N.Y.S. Thruway Auth.*, 234 F. Supp. 2d 446, 448 (S.D.N.Y. 2002).

     If the...action involves an issue of social or economic policy and designs a classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights, the classification must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.

*Id.* (internal quotation marks and citation omitted).  However, "[a] governmental action that disadvantages a suspect class or infringes a fundamental right is subject to strict scrutiny, and can be upheld only if it is necessary to achieve a compelling governmental purpose[.]"  *Peel v. Crew*, 96-CV-7154, 1996 WL 719378, at *14 (S.D.N.Y. Dec. 13, 1996).

Grand Island Bridge toll policy discriminates against non-Grand Island residents in favor of similarly situated Grand Island residents and that this selective treatment is based on an impermissible intent to inhibit non-residents' constitutional right to travel.

"It is beyond dispute that the Fourteenth Amendment guarantees a fundamental right to travel." *Town of Southold*, 406 F. Supp. 2d at 241; *see also Attorney Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 901-903 (1986). The right to travel encompasses three different components. "It protects the right of a citizen of one State to enter and to leave another State, the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State, and, for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State." *Saenz v. Roe*, 526 U.S. 489, 500 (1999).

The Supreme Court has explained, "[a] state law implicates the right to travel when it actually deters such travel,...when impeding travel is its primary objective,...or when it uses any classification which serves to penalize the exercise of that right." *Soto-Lopez*, 476 U.S. at 903 (internal quotation marks and citation omitted). Moreover, "State laws that discriminate against out-of-state residents solely by reason of their place of

residency...risk being invalidated...unless there is some compelling reason for the discrimination."  *Stevenson*, 433 F. Supp. 2d at 267.

With these principles in mind, in order to prove that their claim is within the relevant zone of interests to be protected, plaintiffs must allege that the Grand Island toll policy (1) actually deters *interstate* travel by placing an unlawful burden on their right to enter and/or leave a State, (2) impedes *interstate* travel as its primary objective, or (3) uses an impermissible classification (i.e., race or religion) which penalizes the exercise of their right to *interstate* travel.[15]  Plaintiffs contend that defendants' toll scheme violates their constitutional rights because the "classification" used by the NYTA, *i.e.*, Grand Island residency, places upon them an unfair burden while exercising their right to travel.

In *Bray v. Alexandria Women's Health Clinic*, abortion clinics and abortion rights' organizations applied for a permanent injunction to enjoin anti-abortion members from obstructing access to facilities providing abortion services and relating counseling.  *See Bray v. Alexandria Women's*

---

[15]The so-called "penalties" analysis has been questioned by some courts.  Defendants point out that the penalties discussed in the case law cited by plaintiffs involve direct sanctions discriminatorily applied against interstate travelers serving to interfere with otherwise recognized fundamental rights.  *See Minn. Senior Fed'n v. U.S.*, 273 F.3d 805, 810 (8th Cir. 2001); *Dunn v. Blumstein*, 405 U.S. 330, 339-340 (1972).

*Health Clinic*, 506 U.S. 263 (1993).  In discussing the right to travel, the

*Bray* court explained that the right to travel,

> protects *interstate* travelers against two sets of burdens: the erection
> of actual barriers to interstate movement and being treated differently
> from intrastate travelers....As far as appears from this record, the only
> actual barriers to...movement that would have resulted from
> petitioners' proposed demonstrations would have been in the
> immediate vicinity of the abortion clinics, restricting movement from
> one portion of the Commonwealth of Virginia to another.  *Such a
> purely intrastate restriction does not implicate the right of interstate
> travel, even if it is applied intentionally against travelers from other
> States, unless it is applied discriminatorily against them.*

*Bray*, 506 U.S. at 277 (emphasis added) (internal quotation marks and

citation omitted).  As such, in order to come within the relevant zone of

interests, plaintiffs must allege some burden on *interstate* travel greater

than the alleged burden on plaintiffs' travel to and from Grand Island.

As stated, plaintiffs fail to allege how their residency status unlawfully

burdens their travel between states.  Moreover, plaintiffs have not even

alleged that the questioned portion of Grand Island Bridge serves as an

access route from one State to another.  As far as the court can tell, the

questioned portion serves only New York State and treats both New York

non-Grand Island residents and out-of-State non-Grand Island residents

alike.

31

Plaintiffs' claim that defendants' toll policy violates their fundamental right to travel.  However, in order for their Equal Protection claim to fall within the relevant zone of interests, plaintiffs must assert some considerable burden on *interstate* travel.  Construing the amended complaint in the light most favorable to plaintiffs, the allegations do not satisfy their minimal pleading requirements.  Accordingly, plaintiffs do not satisfy the requirements of prudential standing, and their Equal Protection claim is dismissed.

Even if the court were to conclude that plaintiffs had standing to pursue their Equal Protection claim, it would nonetheless fail on the merits. As defendants correctly point out, any burden on the right to interstate travel here is minimal and insufficient to constitute a deprivation.  They cite several cases in support of their contention that "something more than negligible or minimal impacts on the right to travel is required..." in order to invalidate a state action allegedly discriminating against the fundamental right to travel. *Kan. v. U.S.*, 16 F.3d 436, 442 (D.C. Cir. 1994) (holding that the Wright Amendment, an air traffic regulation restricting air traffic from Love Field in the Dallas-Forth Worth area, did not violate the right to travel because any impact on interstate travel - even air travel to and from the

32

Dallas-Fort Worth area - is negligible.); *see also Barber v. State of Haw.*, 42 F.3d 1185, 1197 (9th Cir. 1994) (the alleged impediment must rise to the level of a "genuinely significant deprivation"); *Haw. Boating Ass'n v. Water Transp. Facilities*, 651 F.2d 661 (9th Cir. 1981) (reduced harbor fees to residents did not implicate constitutional right to travel); *Doe v. Moore*, 410 F.3d 1337, 1348 (11th Cir. 2005) ("mere burdens on a person's ability to travel from state to state are not necessarily a violation of their right to travel").

Here, plaintiffs have not claimed to be members of a suspect class. Furthermore, they have not alleged a violation of a fundamental right since "something more than a negligible or minimal impact on the right to travel is required before strict scrutiny is applied." *Kan.*, 16 F.3d at 442. As such, if the court were to review plaintiffs' Equal Protection claim, it would have to apply a rational basis standard of review.

"The first step in determining whether legislation survives rational-basis scrutiny is identifying a legitimate government purpose which the enacting government body could have been pursuing." *Mulroe*, 234 F. Supp. 2d at 448. "The actual motivations of the enacting governmental body are entirely irrelevant....Indeed, the Equal Protection Clause does not

33

even require government decisionmakers to articulate any reason for their actions,...nor does it require any evidence on the record of a legitimate purpose." *Id.* "The second step of rational-basis scrutiny asks whether a rational basis exists for the enacting governmental body to believe that the legislation would further the hypothesized purpose." *Id.* "As long as reasons for the legislative classification may have been considered to be true, and the relationship between the classification and the goal 'is not so attenuated as to render the distinction arbitrary or irrational,' the legislation survives rational-basis scrutiny." *Id.* (citing *Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992)).

A state or subdivision may pass laws to "protect the health, safety, and welfare of [its] citizens." *Gonzales v. Raich*, 545 U.S. 1, 30 n.38 (2005) (internal quotation marks and citation omitted).  Therefore, if there is any reasonably conceivable state of facts that could provide a rational basis for believing that the toll policy is rationally related to these goals, it will pass constitutional muster.

Here, defendants proffer the following legitimate purpose for their toll program: "the effort to ameliorate the disparate burden that would befall geographically bridge-dependent residents of Grand Island and the

34

secondary effects of this drain on the community." *Def. Mem., Dkt. No. 6.*

Plaintiffs do not dispute that this purpose is legitimate, and under rational

basis review, the toll policy must be upheld.  Accordingly, because they lack

prudential standing to pursue their Equal Protection claim, and in the

alternative, it fails to on the merits, plaintiffs' Equal Protection claim is

**DISMISSED**.

 **WHEREFORE**, for the foregoing reasons, it is hereby

 **ORDERED** that defendants' motions to dismiss is **GRANTED**, and it

is further

 **ORDERED** that plaintiffs' amended complaint is **DISMISSED IN ITS**

**ENTIRETY**, and it is further

 **ORDERED** that the Clerk provide a copy of this Decision and Order to

the parties.

**IT IS SO ORDERED.**

January 18, 2007
Albany, New York

Gary L. Sharpe
U.S. District Judge

35